[Cite as *In re C.W.G.*, 2016-Ohio-5448.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

IN THE MATTER OF:

|  |  |  |
|---|---|---|
| C.W.G., | : | Case No. 16CA12 |
|  | : |  |
|  | : |  |
| Adjudicated Abused/Neglected/ | : |  |
| Dependent Child. | : | <u>DECISION AND</u> |
|  | : | <u>JUDGMENT ENTRY</u> |
|  | : |  |
|  | : | RELEASED 08/16/2016 |

---

### APPEARANCES:

Robert Henry, Law Office of Robert Henry, LLC, Marietta, Ohio, for appellant.

Kevin Rings, Washington County Prosecuting Attorney, and Amy Graham, Washington County Assistant Prosecuting Attorney, Marietta, Ohio, for appellee.

---

Hoover, J.

{¶1}    Appellant, L.L., appeals the trial court's judgment that awarded appellee, Washington County Children Services Board (WCCS), permanent custody of her biological child, C.W.G. For the reasons that follow, we affirm the trial court's judgment.

### I.  Facts

{¶2}    C.W.G. was born prematurely in January 2012. At the time of his birth he tested positive for the anti-anxiety drug benzodiazepine. When C.W.G. was approximately one year of age, he and appellant were referred to the Washington County Board of Developmental Disabilities and other social services because of C.W.G.'s extreme delays. At the time, C.W.G. was not walking or talking, and had motor and

social skill delays. Appellant refused services for C.W.G. because she said she was moving. Tests conducted six months later showed that C.W.G.'s delays had increased.

{¶3}    WCCS and other agencies worked with appellant and her father, W.G., to address C.W.G.'s developmental concerns. Appellant cared for C.W.G. with assistance from W.G., during C.W.G.'s first years. Some progress was made; but appellant was inconsistent and missed a significant amount of appointments with service providers.

{¶4}    WCCS's history with the appellant also included several concerned calls about appellant's drug use and C.W.G.'s well being. WCCS retrieved the child's medical records that indicated that he was diagnosed with low muscle development and Global developmental delay. The medical records further contained recommendations for follow-up tests and examinations, specifically for possible chromosomal disorders. WCCS alleged that appellant did not follow through with those recommendations and that at two years of age C.W.G. was still drinking from a bottle, not eating food, could not walk, sit by himself, feed himself, or talk. Appellant denied some of these allegations.

{¶5}    In early May 2014, appellant was found passed-out at a fast-food drive thru with C.W.G. in the car. As a result of the incident appellant was arrested and charged with OVI; and C.W.G. was briefly placed in the care of W.G. under an agreed safety plan. After it was learned that W.G. violated the safety plan by leaving C.W.G. unsupervised with a suspected drug user, WCCS obtained emergency custody of C.W.G. on May 6, 2014.

{¶6}    On May 7, 2014, WCCS filed abuse, neglect, and dependency complaints concerning C.W.G. and requested temporary custody of the child. On June 2, 2014, the maternal grandfather, W.G., filed a motion for custody of C.W.G. On June 9, 2014, after

an initial hearing, the trial court concluded that it was in the best interest of C.W.G. to remain in the temporary custody of WCCS. On July 7, 2014, the trial court adjudicated the child abused, neglected, and dependent and awarded WCCS temporary custody of C.W.G. C.W.G. was then placed in a foster home. While in the temporary custody of WCCS and in the home of the foster family C.W.G.'s health and development improved greatly.

{¶7} WCCS developed a case plan with the goal of reunification that required appellant, among other things, (1) to remain sober, (2) to no longer misuse prescribed medication, (3) to attend substance abuse counseling and submit to random drug screens, (4) to participate in the Help Me Grow Program, (5) to attend a parenting education class, (6) to provide food and basic needs of C.W.G. during visitations, (7) to have a regular form of income, (8) to attend all service provider meetings and follow all recommendations of the service providers, (9) to attend all of C.W.G.'s medical appointments, and (10) to ensure a safe, stable home environment for C.W.G. WCCS also developed a case plan that required W.G., among other things, (1) to ensure all bed bugs were gone from his residence, (2) to have all guns and safety threats locked away at all times while C.W.G. was at the residence, (3) to attend all service provider meetings and follow all recommendations of the service providers, (4) to complete a home study, and (5) to attend all of C.W.G.'s medical appointments.

{¶8} On April 3, 2015, appellant filed a motion for custody.

{¶9} On October 21, 2015, WCCS filed its motion for permanent custody. WCCS alleged that C.W.G. had been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of

a consecutive twenty-two month period. WCCS also argued that obtaining permanent custody would be in C.W.G.'s best interest. WCCS asserted that appellant indicated that she does not abuse drugs even though she continued to test positive during drug screenings. WCCS further claimed that appellant tested positive for amphetamines, methamphetamines, and suboxone in June 2015. WCCS contended that appellant was discharged from drug counseling services due to "drug seeking behaviors". WCCS alleged that appellant also failed several drug screens administered by her probation officer in the summer and fall of 2015. WCCS alleged that while appellant has always denied using drugs, all three of her children have been born with withdrawal symptoms and have suffered medical problems as a result. Finally, WCCS alleged that appellant did not make any progress to indicate that she would be able to provide C.W.G. with basic and special needs to keep him safe and that nothing had really changed in appellant's lifestyle from the time WCCS obtained temporary custody of C.W.G.

{¶10}  On January 6, 2016, WCCS filed a semi annual administrative review. In it, WCCS asserted that appellant was arrested and sent to the Washington County Jail due to a failed drug screen given by her probation officer in October 2015. WCCS further noted that once released from jail appellant began a Vivitrol treatment program for her opioid drug addiction. The review also noted that in the prior six months appellant had missed 13 visits with C.W.G. and several home visits with the agency.

{¶11}  On February 16, 2016, W.G., the maternal grandfather, again filed a motion for custody of C.W.G.

{¶12}  On February 22, 2016, the trial court held a hearing to consider WCCS's permanent custody motion. Nancy Coleman, a developmental specialist at the

Washington County Board of Developmental Disabilities, testified that C.W.G. qualified for services through Help Me Grow prior to WCCS taking temporary custody. Coleman explained that appellant initially refused services through Help Me Grow because she indicated she was moving. Several months later C.W.G. was again referred to the Help Me Grow program. Coleman stated that additional testing revealed that C.W.G.'s developmental delays had increased in severity from the time he was initially tested. Appellant eventually enrolled C.W.G. in the Help Me Grow program in August 2013. Coleman noted that once enrolled appellant missed 25 of the 35 scheduled appointments between July 2013 and April 2014. During those missed appointments, however, Coleman indicated that W.G. was present and was C.W.G.'s main caretaker. Coleman stated that while W.G. "was there", he could not physically and readily do the things necessary to significantly improve C.W.G.'s development. Coleman noted that W.G. has an artificial leg that impedes his movement and lacked necessary parenting skills because in the past he was a working dad who had never really raised a little child before. Coleman did credit W.G. with keeping C.W.G. safe and providing C.W.G. with love. Coleman also explained that after being placed with the foster family she noticed significant and drastic improvements in C.W.G.'s development. Finally, Coleman stated that she would be concerned if C.W.G. was returned to the care of his mother or grandfather.

{¶13} Marietta Municipal Court probation officer Eric Brockmeier testified that he began supervising appellant when she was placed on probation for the offense of OVI in October 2014. According to Brockmeier, he had to revoke appellant's probation for multiple failed drug tests. He noted that appellant is addicted to opioids and

benzodiazepines and she had also tested positive for amphetamines and methamphetamines. Brockmeier testified that appellant had entered drug counseling but was unsuccessfully terminated due to constant relapse. Brockmeier opined that it would be "very concerning" if C.W.G. was returned to appellant's custody

{¶14}  WCCS caseworker Emily Tewanger testified that appellant "was very unsuccessful at times" in meeting the goals of the case plan and that it was very difficult to meet with appellant. Tewanger stated that appellant missed numerous home visits and often times refused to answer her phone. Tewanger testified that appellant's home was often cluttered with belongings strewn about the floor. Tewanger also stated that appellant only attended 61% of the scheduled visitations she had with C.W.G. Tewanger testified that appellant became pregnant while C.W.G. was in the temporary custody of WCCS, and that that child had been born addicted to drugs and with severe withdrawal symptoms. Tewanger also indicated that W.G. appeared to be the primary caretaker of C.W.G., not appellant. However, Tewanger was concerned about the environment at W.G.'s residence, and noted that appellant's brother lived with W.G. and also appeared to have substance abuse problems. Tewanger also stated that W.G. had once indicated that he did not know if he could care for C.W.G. given his age and health. Tewanger also testified that a home study for W.G.'s residence was denied due to a previous criminal conviction and an active case of bed bugs. Specifically, Tewanger testified that W.G. had pled guilty to menacing by stalking, but that the charge had originally been conspiracy to commit murder.

{¶15}  WCCS visitation coordinator Amanda Reed testified that appellant and W.G. did not consistently attend their scheduled visitations with C.W.G. and that there

were a lot of missed visits. Reed stated that appellant and W.G. also failed to properly

discipline C.W.G. during monitored visits, allowed C.W.G. to eat food off of unsanitary

places, and consistently brought food to visits to which C.W.G. was allergic. Reed

indicated that C.W.G. interacted more with W.G. than appellant during visits. Reed also

testified that W.G. was only permitted to visit C.W.G. if appellant was also present.

{¶16}  WCCS caseworker Pamela McKenna testified that appellant was rarely

home and that she had trouble meeting appellant at her home. McKenna also indicated

that appellant failed to make substantial progress towards many of her case plan goals.

McKenna testified that substance abuse remained "a big issue" and that appellant doctor

shops to obtain prescription medication. McKenna also identified poor attendance at drug

counseling and poor compliance with probation as "big issue[s]". McKenna stated that

appellant had been in jail for probation violations several times in the months leading up

to the custody hearing. Finally, McKenna testified that she did not see any bonding

between C.W.G. and appellant; but that C.W.G. had bonded quite well with the foster

family.

{¶17}  C.W.G.'s foster mother testified with regards to C.W.G.'s developmental

delays and improvements while in foster care. When the foster family first received

C.W.G. in May 2014, he was 28 months old and could not roll over, crawl, walk, talk, or

pull himself up. Within days of receiving C.W.G. and taking an active involvement in his

care the foster mother noted drastic improvements. By the time of the permanent custody

hearing, the foster mother indicated that she believed C.W.G. to be mostly caught-up in

his development. The foster mother also stated that in the recent months preceding the

hearing C.W.G. would throw fits and act out prior to leaving for visitations with

appellant. She also indicated that appellant and W.G. never attended any of C.W.G.'s medical appointments.

{¶18}  The parties stipulated to the guardian ad litem reports that had been filed in the case. In addition, the child's guardian ad litem testified at the hearing that placing C.W.G. in W.G.'s home would not be desirable because the child's uncle, W.G.'s son, also resides in the residence and the uncle  "is not an appropriate person to be around [C.W.G.]". He also stated that he did not believe the home would pass a home study as long as the uncle remains in the home.

{¶19}  Appellant testified that it had been seven years since she had abused opioids, except that just prior to the permanent custody hearing she admitted to taking one Vicodin. She stated that she has been prescribed suboxone for the past six years. Appellant indicated that she was involved in "intensive" drug and alcohol counseling that includes weekly individual and group sessions. Appellant also claimed that any failed drug screens, with the exception of the one time she took the Vicodin, were the result of prescribed medication, and that she does not use street drugs. Appellant explained that many of her missed visitations were the result of medical appointments, specifically appointments at suboxone clinics that required travel to Columbus. She described W.G. as her best friend and agreed that C.W.G. was very close to his grandfather. Appellant requested that the trial court award her custody of C.W.G., but if that could not be done, she expressed her desire that C.W.G. be placed with W.G.

{¶20}  W.G. testified that he has lived at his current residence for almost seven years. He indicated that he has a steady source of income of $5,500 per month. He agreed that his son also lives at the residence and is dependent upon pain medication, but

testified that his son suffers from cancer and that a mass on his spine is the cause of his son's pain problems. W.G. also denied ever leaving C.W.G. alone with his son. W.G. stated that he had been C.W.G.'s main caretaker up until the time that WCCS obtained temporary custody. W.G. testified that he performed exercises with C.W.G. to aid his physical and social development. W.G. also testified that he was only permitted to visit C.W.G. when appellant was also present, and when appellant missed visitations he was not permitted to visit with C.W.G. Finally, W.G. testified that he thought it would be in C.W.G.'s best interest if custody was awarded to him.

{¶21} On March 21, 2016, the trial court granted appellee permanent custody of the child. The court found that the child had been in appellee's temporary custody for at least twelve out of the past twenty-two months. The court also determined that awarding appellee permanent custody of C.W.G. would serve his best interest. The court considered the child's interactions and interrelationships. The court found that appellant "showed very little involvement in her son's welfare" and had "very little bonding with the child." The court noted that the mother only visited C.W.G. 61% of the time, missed 25 out of 35 appointments with the Early Intervention Specialist, and continued to abuse drugs.

{¶22} The court also determined that C.W.G.'s father had abandoned the child. The court observed that the father had not had any involvement with his son; and that his present whereabouts were unknown.

{¶23} The court noted that the maternal grandfather, W.G., had "appeared to be the primary caretaker of the child rather than the mother"; but noted that an early intervention worker with the Developmental Disabilities Board (Coleman) had indicated

that W.G. was not a suitable placement for the child. The court further stated: "Although the grandfather was very loving and concerned about the child and receptive to the services and trainings offered, he was not able to effectively help his grandson."

{¶24} The court observed that since being placed in the foster home C.W.G.'s development had greatly improved. The court recognized that at the time of the final hearing C.W.G. was running, eating regular food with utensils, and talking more; but that his speech was still delayed. The court also noted that the early intervention worker stated that C.W.G. would not be at the level he is at if not placed in foster care. Finally, the court noted that C.W.G. was "doing extremely well in the current foster home" but that the foster parents were not seeking to adopt C.W.G. due to their age.

{¶25} The court reviewed the child's custodial history and found that he was in appellant's custody from his birth in January 2012 until May 2014, when appellee obtained temporary custody. Although appellant was technically in custody of C.W.G. during his first years, the court noted that W.G., the maternal grandfather, appeared to be the primary caretaker. Since May 2014, the child has remained in appellee's temporary custody.

{¶26} The court further determined that C.W.G. needs a legally secure permanent placement and that this type of placement cannot be achieved without granting appellee permanent custody. The court found that C.W.G. lacked a bond with appellant and W.G., that appellant failed to work with the service providers, that appellant's home "was never acceptable other than one time during the one and half years she was involved with the case", that the father essentially abandoned the child, that W.G. lacked parenting skills and other abilities due to his age and artificial leg and was incapable of parenting a

young child with delays, and that no suitable relative placement was available. The court

also noted that W.G. was not a suitable placement option because his home study was

denied "due to a past conviction for menacing by stalking which was originally charged

as conspiracy to commit murder". Finally, the court noted that the early intervention

worker indicated that she "would be concerned if the child was returned to the mother or

grandfather as neither is able to handle his issues" and that appellant's probation officer

expressed that he "would be very concerned if the child was returned to the mother due to

her significant unaddressed drug problem." The court thus granted appellee permanent

custody of the children. This appeal followed.

## II. Assignment of Error

{¶27}  Appellant raises one assignment of error.

> The juvenile court abused its discretion, and its judgment was against the
> weight of the evidence, when it found that it was in the best interest of the
> child to permanently terminate the parental rights of the mother and award
> Appellee permanent custody.

## III. Law and Analysis

{¶28}  In her sole assignment of error, appellant contends that the trial court erred

by determining that awarding appellee permanent custody was in the child's best interest.

Appellant does not dispute that C.W.G. had been in appellee's custody for at least twelve

of the past twenty-two months. She also does not challenge the court's finding that the

child should not be returned to her care. Instead, appellant disputes the court's finding

that the child could not achieve a legally secure permanent placement without granting

permanent custody to appellee. Appellant argues that the child's grandfather, W.G., could

have provided a legally secure permanent placement for the child and, thus, awarding

permanent custody was not necessary.

## A. Standard of Review

{¶29} A reviewing court generally will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. *In re R.M.,* 2013–Ohio–3588, 997 N.E.2d 169, ¶ 53 (4th Dist.).

> "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' "

*Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶ 12, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

{¶30} When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court " ' "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." ' " *Eastley* at ¶ 20, quoting *Tewarson v. Simon,* 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001), quoting *Thompkins* at 387, quoting *State v. Martin,*

20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *Accord In re Pittman,* 9th Dist. Summit No. 20894, 2002–Ohio–2208, ¶¶ 23–24.

{¶31}   In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.,* 119 Ohio St.3d 538, 2008–Ohio–4825, 895 N.E.2d 809, ¶ 43. "Clear and convincing evidence" is: "[T]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes,* 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986). In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel,* 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). *Accord In re Holcomb,* 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), citing *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof."). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence."  *R.M.* at ¶ 55.

{¶32}  Once the reviewing court finishes its examination, the court may reverse the judgment only if it appears that the fact-finder, when resolving the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin* at 175. A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the [decision].' " *Id.,* quoting *Martin* at 175; *accord State v. Lindsey,* 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

{¶33}  Furthermore, when reviewing evidence under the manifest weight of the evidence standard, an appellate court generally must defer to the fact-finder's credibility determinations. As the *Eastley* court explained:

> "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *
>
> If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

**B. Permanent Custody Principles**

{¶34}   A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Murray,* 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); *accord In re D.A.,* 113 Ohio St.3d 88, 2007–Ohio–1105, 862 N.E.2d 829. A parent's rights, however, are not absolute. *In re D.A.* at ¶ 11. Rather, " 'it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " *In re Cunningham,* 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.,* 300 So.2d 54, 58 (Fla.App.1974). Thus, the State may terminate parental rights when a child's best interest demands such termination. *In re D.A.* at ¶ 11.

{¶35}   Before a court may award a children services agency permanent custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing. The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. *Id.* Additionally, when considering whether to grant a children services agency permanent custody, a trial court should consider the underlying purposes of R.C. Chapter 2151, as set forth in R.C. 2151.01:

> (A) To provide for the care, protection, and mental and physical development of children * * * whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety;

(B) To provide judicial procedures through which Chapters 2151. and 2152. of the Revised Code are executed and enforced, and in which the parties are assured of a fair hearing, and their constitutional and other legal rights are recognized and enforced.

### C. Permanent Custody Framework

{¶36}  R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public

children services agencies or private child placing agencies for twelve or

more months of a consecutive twenty-two-month period, or the child has

been in the temporary custody of one or more public children services

agencies or private child placing agencies for twelve or more months of a

consecutive twenty-two-month period and, as described in division (D)(1)

of section 2151.413 of the Revised Code, the child was previously in the

temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from

whose custody the child has been removed has been adjudicated an

abused, neglected, or dependent child on three separate occasions by any

court in this state or another state.

{¶37}  R.C. 2151.414(D) requires a trial court to consider specific factors to

determine whether a child's best interest will be served by granting a children services

agency permanent custody. The factors include: (1) the child's interaction and

interrelationship with the child's parents, siblings, relatives, foster parents and out-of-

home providers, and any other person who may significantly affect the child; (2) the

child's wishes, as expressed directly by the child or through the child's guardian ad litem,

with due regard for the child's maturity; (3) the child's custodial history; (4) the child's

need for a legally secure permanent placement and whether that type of placement can be

achieved without a grant of permanent custody to the agency; and (5) whether any factors

listed under R.C. 2151.414(E)(7) to (11) apply.

{¶38}  Thus, before a trial court may award a children services agency permanent custody, it must find (1) that one of the circumstances described in R.C. 2151.414(B)(1) applies, and (2) that awarding the children services agency permanent custody would further the child's best interests.

{¶39}  In the case at bar, appellant does not challenge the trial court's R.C. 2151.414(B)(1) finding. Therefore, we do not address it. Instead, appellant focuses her argument on the trial court's best interest determination.

### D. Best Interest

{¶40}  Here, the only best interest factor appellant challenges is the court's finding regarding the child's need for a legally secure permanent placement and whether that type of placement can be achieved without granting permanent custody to appellee. Appellant contends that the evidence shows that the child's grandfather, W.G., could provide a legally secure permanent placement for the child. She further argues that W.G. was heavily involved in raising C.W.G. before his removal, that W.G. possessed the necessary skills and physical ability to raise the child, and that W.G. demonstrated a willingness to work with area agencies to aid in the development of C.W.G. Appellant thus contends that the court should have placed the child with the grandfather.

{¶41}  We do not agree with appellant that the trial court should have placed the child with the grandfather. We have previously recognized that a trial court need not consider relative placement before awarding a children services agency permanent custody. *E.g., In re M.M.*, 4th Dist. Meigs No. 14CA6, 2014-Ohio-5111, ¶ 39; *In re J.H.*, 4th Dist. Hocking No. 14CA4, 2014-Ohio-3108, ¶ 27; *In re C.T.L.A.*, 4th Dist. Hocking No. 13CA24, 2014-Ohio-1550, ¶ 52. In *J.H.,* we explained:

[In *In re Schaefer,* 111 Ohio St.3d 498, 2006–Ohio–5513, 857 N.E.2d 532, the court] rejected the argument that a trial court must find by clear and convincing evidence that no suitable relative is available for placement before awarding a children services agency permanent custody. The court explained that R.C. 2151.414(D)(1)(d) is not entitled to any "heightened importance," and the trial court is not "required to credit evidence in support of maintaining the parental relationship when evidence supporting termination outweighs it clearly and convincingly." *Id.* at ¶ 56, 857 N.E.2d 532. The *Schaefer* court further rejected any argument that a juvenile court must determine by clear and convincing evidence that "termination of appellant's parental rights was not only a necessary option, but also the only option" or that "no suitable relative was available for placement." *Id.* at ¶ 64, 857 N.E.2d 532. The court stated that R.C. 2151.414(D) "does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor," and it "does not even require the court to weigh that factor more heavily than other factors." *Id. Accord C. T.L.A., supra,* at ¶ 52 (stating that trial court "had no duty to first consider placing the child with [a]ppellant's relatives or a family friend before granting [a]ppellee permanent custody"); *In re J.K.,* 4th Dist. Ross No. 11CA3269, 2012–Ohio–214, ¶ 27 and ¶ 30; *In re A.C.H.,* 4th Dist. Gallia No. 11 CA2, 2011–Ohio–5595, ¶ 44; *In re M.O.,* 4th Dist. Ross No. 10CA3189, 2011–Ohio–2011, ¶ 20 (stating that children services agency "had no statutory duty to make 'reasonable efforts' to effect a relative

placement before seeking permanent custody * * * * [, and] the juvenile court did not have to find by clear and convincing evidence that no suitable relative was available for placement before awarding the agency permanent custody").

*Id.* at ¶ 27; *accord In re A.R.*, 4th Dist. Highland No. 14CA10, 2014-Ohio-4916, ¶ 21.

{¶42}  Here, the trial court considered whether placing the child with the grandfather would be in the child's best interest and found that it would not. The court offered a logical rationale for rejecting the grandfather's request for legal custody of the child. The court explained that the grandfather was limited in his abilities due to his age and artificial leg, which made it difficult to work with the child on the floor. The court further observed that the grandfather lacked necessary parenting skills and was unable to effectively help the child in his development. These findings are supported by witness testimony, especially the testimony of Nancy Coleman and Emily Tewanger who were able to observe grandfather and C.W.G.'s interactions. Moreover, the fact that C.W.G. saw almost immediate developmental improvements upon his placement with the foster family further supports the court's finding that W.G. could not effectively parent a young child with delays. The court also found relevant the fact that grandfather's home study was denied due to his past conviction. The court could have concluded that placing C.W.G. in the grandfather's custody would not have led to a stable, safe, and secure life for the child. *See In re A.R.* at ¶¶ 2, 11, and 24 (holding that grandmother's prior marijuana possession conviction supported trial court's finding that grandmother would not be able to provide grandchildren with a legally secure permanent placement).

{¶43} We therefore disagree with appellant that the trial court wrongly determined that the child needed a legally secure permanent placement that could not be achieved without granting appellee permanent custody.

### IV. Conclusion

{¶44} Accordingly, based upon the foregoing reasons, we overrule appellant's sole assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

**JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED. Appellant shall pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J.: Concurs in Judgment and Opinion.
McFarland, J.: Concurs in Judgment Only.

For the Court

By:_____
        Marie Hoover, Judge


**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.